Leatrice CARTER, et al.,
Plaintiffs-Appellants,

v.

Robert B. BERGER and the Berger Group, Inc., Defendants-Appellees.

No. 85–1384.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1985.

Decided Nov. 14, 1985.

As Amended Nov. 21, 1985.

Richard T. Ryan, Flynn, Galvin & Ryan, Chicago, Ill., for plaintiffs-appellants.

Don H. Reuben, James H. Alesia, Katherine E. Rakowsky, Reuben & Proctor, Chicago, Ill., for defendants-appellees.

Before BAUER, POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

A fraud committed against one person often injures others. Both the defrauded party and those indirectly injured may seek to recover for their losses. In this case the district court dismissed a suit by an indirectly injured party. We agree with the district court that the directly injured party is the right plaintiff.

In 1982 Robert B. Berger pleaded guilty to an indictment charging him with paying money to employees of the Cook County Board of Appeals in order to obtain lower tax assessments for property of his clients. The plea admitted acts that could constitute a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, because the payments entailed multiple violations of state law against bribery and the federal law against mail fraud. The plaintiffs in this case— claiming that they had to pay more tax because Berger's clients paid less—then filed this suit under the civil damages provision of RICO, 18 U.S.C. § 1964(c), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter ... shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." See *Sedima, S.P.R.L. v. Imrex Co.,* — U.S. —, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). A little later Cook County filed an independent suit under RICO, seeking to recover the taxes it had lost because of the reduction in the assessed valuation of Berger's clients' property.

Berger moved to dismiss the taxpayers' suit, and the district court granted the motion. The court cited as authority Fed.R. Civ.P. 17(a), which requires every suit to "be prosecuted in the name of the real party in interest." The real party in interest, the court thought, is the one "who, by substantive law, possesses a right sought to be enforced and not necessarily the party who will ultimately benefit from the recovery." Once the County brought its own suit, it became the real party in interest. That the taxpayers would be the ultimate beneficiaries of the County's recovery did not make them real parties in interest.

■ We, like the district court, conclude that the taxpayers are not the right parties to bring this suit. The taxpayers' injury derives from the County's, and although investors in private corporations sometimes may file suits in the right of the corporation, no similar doctrine allows derivative suits on behalf of agencies of government. The closest analogy is the *qui tam* action, a private suit in the right of the government with the recovery flowing to the government. *Qui tam* suits are now specialties of statute. When the government takes over or dismisses the suit, the private party has no recourse. See *The Confiscation Cases,* 74 U.S. (7 Wall.) 454, 19 L.Ed. 196 (1868); cf. *Leeke v. Timmerman,* 454 U.S. 83, 102 S.Ct. 69, 70 L.Ed.2d 65 (1981).

The taxpayers reply that they seek recovery not for the County but for themselves. RICO permits each person to recover for injury to his "business or property." The County, as the taxpayers see things, suffered no injury. When the Board of Appeals reduced the assessments of some property, the total valuation of property in the County fell. The lower aggregate valuation did not diminish the revenue needs of the political subdivisions in the County, however. Each subdivision determines its needs and passes this information to the Cook County Collector. The Collector selects a rate of taxation per $100 of assessed valuation that will generate the desired revenue. To obtain this revenue the Collector had to increase the tax rate to make up for the shortfall caused by the fraudulently reduced assessments. The plaintiffs had to pay a higher rate of tax (and thus a higher total tax) on their property than they would have done had Berger's clients' property been assessed honestly. This is an injury to the taxpayers'

"property"—their money: *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906); cf. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). On the rationale that what helps one taxpayer hurts another, Illinois law permits taxpayers to seek injunctions challenging exclusions from real estate taxes. *McKenzie v. Johnson*, 98 Ill.2d 87, 74 Ill.Dec. 571, 456 N.E.2d 73 (1983). Therefore, the argument concludes, the taxpayers rather than the County should recover under RICO.

This is a cousin to the "passing on" argument in antitrust law. A cartel establishes an overcharge, which the buyer pays. When the buyer is a middleman, such as a retailer or a construction contractor, it may pass the overcharge along. Because everyone else pays the overcharge, each can raise the price at which it sells its own product. The next purchaser in line will be stuck with some, perhaps all, of the overcharge. See Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U.Pa.L.Rev. 269, 277–98 (1979); Robert Cooter, *Passing on the Overcharge: A Further Comment on Economic Theory*, 129 U.Pa.L.Rev. 1523 (1981). The response of antitrust law is stark: the direct purchaser recovers from the wrongdoer the full overcharge, trebled, even if it also recovered the whole overcharge by raising its own prices. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 488–94, 88 S.Ct. 2224, 2228–32, 20 L.Ed.2d 1231 (1968). The indirect purchaser recovers nothing, even if it bore the whole overcharge and even if the direct purchaser did not sue. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

The same approach prevails throughout the law. The person who pays an excessive charge for transportation recovers the overage, even though it may have collected an enhanced fee from its own customers. See *Southern Pacific Co. v. Darnell-Taenzer Co.*, 245 U.S. 531, 533, 38 S.Ct. 186, 62 L.Ed. 451 (1918), in which Justice Holmes remarked that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." See also *ICC v. United States*, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273 (1933); *Adams v. Mills*, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184 (1932). A firm that catches an employee with a hand in the till is entitled to recover the stolen money in court, even though it may also "recover" the money by withholding a bonus and may have offset the loss by reducing the employee's salary after suspecting theft. A pedestrian is entitled to recover for loss caused by being run over by a speeding motorist, even though the pedestrian also has insurance. The "collateral benefit" rule of tort law rests on the belief that the wrongdoer should be made to pay—the better to deter like conduct—whether or not the victim has providently supplied another source of compensation, unless the supplier of the compensation has a subrogation clause.

The other part of Justice Holmes's "tendency"—that the indirectly injured party may not sue—is equally well established. If a wrong committed against a firm causes it to become bankrupt and discharge its employees or discontinue its purchases, the injured employees and suppliers may not sue. See *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 473–74 (7th Cir.1982) (discussing standards in tort law); *In re Industrial Gas Antitrust Litigation*, 681 F.2d 514 (7th Cir.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983). The investors in the firm suffer when the firm incurs a loss, yet only the firm may vindicate the rights at issue. The principle applies even in constitutional law. Only the directly affected party, not those who feel the repercussions, gets a hearing under the Due Process Clause. *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980).

■ These principles should apply to RICO cases, not the least because the damages provision in § 1964(c) is practically verbatim the damages provision in the anti-

trust laws. See 15 U.S.C. § 15. *Sedima* held that the "antitrust injury" rule of antitrust does not apply to RICO, see 105 S.Ct. at 3284–87, but this is so because "RICO injury" would be an unintelligible requirement, not because there is no parallel between the two statutes. See 105 S.Ct. at 3282 & n. 8 (remarking that Congress relied on the analogy to antitrust). We conclude that the directly injured party should receive a complete recovery, no matter what; an indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief.

■ The County, like the buyer from a monopolist, has a right to recover for the full loss. RICO applies to tax frauds, and a government may recover losses from the underpayment of taxes. *Illinois Department of Revenue v. Phillips*, 771 F.2d 312 (7th Cir.1985). The fact that the County may have recouped the loss by raising the rate of tax does not defeat its recovery. *United States v. Lynch*, 699 F.2d 839 (7th Cir.1982), held that a court, as a condition of probation, may require a person who paid bribes to obtain lower assessments of property to compensate Cook County for lost taxes. We explained (*id.* at 845): "the conspiracy deprived Cook County of tax revenues it was lawfully due. There is no basis in the statute or case law for concluding that the victim of a fraud is not an aggrieved party simply because he obtains compensation from another source." *Phillips* and *Lynch* together ensure that the County is entitled to 100 cents on the dollar (actually 300 cents on the dollar under RICO) for all tax revenues lost as a result of illegal reductions in assessed valuation, no matter what the County may have done in response.

Because the County may recover for the whole loss, the plaintiffs here may not recover. Treble damages, not sextuple damages, are the penalty Congress selected. The taxpayers could argue that they should receive a share of the County's recovery, but the parallel argument on behalf of indirect purchasers was rejected in *Illinois*

*Brick* for reasons that are equally applicable in litigation under RICO.

First, and most important, concentrating the entire right to recover in the hands of the directly injured party promotes deterrence. RICO was designed to make life hard for repeat violators of the criminal law, and it must be generously construed to promote the goal of deterrence. See Pub.L. 91–452 § 904(a), and *Sedima, supra*, 105 S.Ct. at 3280–81 (collecting the sparse legislative history of civil RICO). We serve this purpose by concentrating all recoveries in the County's hands.

Both *Hanover Shoe*, 392 U.S. at 494, 88 S.Ct. at 2232, and *Illinois Brick*, 431 U.S. at 735–37, 745–47, 97 S.Ct. at 2074–75, stressed the increased deterrence that is produced by granting the full recovery to a single person. The person with the best opportunity to uncover a violation is the one directly injured; he has access to the essential facts that may be concealed from others. How is the buyer of a building to know that bricks were the subject of a cartel, or the taxpayer to learn that employees of the Board of Appeals have been bribed? The party with a right to recover the whole loss has the right incentives to investigate potential violations and pursue litigation; people with small stakes neither investigate nor litigate in the ordinary course. Even if some champion discovered the wrong (but who would have the right incentives to be the detective?), "only a small fraction would be likely to come forward to collect their damages" (*Illinois Brick, supra*, 431 U.S. at 747, 97 S.Ct. at 2075).

A class action would aggregate the damages, but there are problems in distribution to which we turn shortly, and the lawyers for the class have their own difficulties with incentives. What makes the lawyers act as faithful agents of the class? None can receive the entire recovery, and all may be tempted to convert the recovery into attorneys' fees or to settle the case for too little. The class action and the entrepreneurial lawyer may be the best possible solution to some legal problems, but here

the assignment of all claims to a single entity is a superior solution. The available evidence, although scanty, suggests that the rule of *Hanover Shoe* and *Illinois Brick* has increased the deterrent power of the antitrust laws, just as the Supreme Court predicted. See Edward A. Snyder, *Efficient Assignment of Rights to Sue for Antitrust Damages*, 28 J.L. & Econ. 469 (1985); Jon M. Joyce & Robert H. McGuckin, *Assignment of Rights to Sue Under* Illinois Brick: *An Empirical Assessment*, Economic Policy Office Working Paper (Department of Justice 1985). We anticipate that a concentration of the right to recover in a single entity, the one with the best access to information, similarly will increase the deterrent force of RICO. As the Supreme Court held in *Sedima*, and we reiterated in *Phillips, supra*, 771 F.2d at 315, the analogy to antitrust should not be pursued at the expense of effective enforcement of RICO. The *Hanover Shoe—Illinois Brick* rule promotes enforcement and therefore applies to RICO, too.

Second, the Court observed in *Illinois Brick* that it is exceptionally difficult to determine just how much of any overcharge is "passed on" by the direct buyer to its customers. Passing on depends on the elasticities of supply and demand for the products that the initial buyers produce. See *Illinois Brick, supra*, 431 U.S. at 731–32, 741–43, 97 S.Ct. at 2072–73. See also *Hanover Shoe, supra*, 392 U.S. at 493, 88 S.Ct. at 2231. The more customers are able to substitute other things for the products of the direct purchaser, the less of the overcharge will be passed on; the more competitive the industry of the initial buyer, the more will be passed on. The Supreme Court thought the calculation of these elasticities so daunting that it was best not to try. So too with this taxpayers' suit. Governmental units of Cook County do not necessarily raise innocent people's taxes by $1 to offset every loss of $1 to fraud. The government is concerned about the overall rate of tax; higher taxes may induce people and businesses to move away and may depress economic activity. Thus the County, like the purchasers from a monopolist, may try to find substitutes that limit the amount of passing on. Governmental units may tighten the purse strings rather than raise taxes, or they may find other sources of revenue. Finding the exact relation between taxes lost and taxes raised would require complicated proceedings.

The Court also was concerned in *Illinois Brick* about the difficulties of apportioning the recovery between the direct and indirect purchasers of the monopolized good. 431 U.S. at 730–31, 738–41, 744–45, 97 S.Ct. at 2073–74. There would be similar difficulties here. How much to the County, how much to the taxpayers? And among the taxpayers, how much to whom? Some taxpayers were the perpetrators rather than the victims of fraud on the Board of Appeals. In consumer class actions the costs of distributing damages often eat up the recovery, leaving little for the victims. The costs of dividing a recovery from Berger among all property taxpayers in Cook County almost surely would do this. On the other hand, when the County recovers all of the damages under RICO, this reduces future taxes and ultimately inures to the benefit of all taxpayers. The reduction will not exactly match the incidence of the loss. It will benefit people according to how much property they own at the time of the recovery, not what they owned at the time of the offense. Some property will have appreciated (or been acquired) in the interim, and other property will have depreciated or been sold. Still, rough justice at moderate cost may be preferable to a form of justice so expensive that it consumes all of the benefits of a better fit between the injured and the compensated. In shareholders' derivative litigation, the corporation collects the award, and investors (including the wrongdoers) gain according to their holdings at the time of the recovery. The approach we adopt here turns out to be widespread.

There are some differences between the direct purchasers' suits in antitrust and governments' suits under RICO. Perhaps the biggest is that a buyer in an antitrust

**1178**

case usually is a private firm with every incentive to seek available recoveries. Few businesses forgo treble damages recoveries unless the prospective defendants offer the putative plaintiffs something even better, such as price concessions that are a form of substitute recovery. Governments lack a similar spur of self-interest. The Cook County Collector does not get a large bonus for an especially big tax season or take home a slice of the damages award in a RICO suit. There are substitutes, such as the glare of publicity, but these may not be as effective.

Perhaps even more troubling, a government may find itself under the sway of the very people whose criminal activities produced the loss from which it suffers. RICO was directed in part against the infiltration of governments by organized criminals. Those who bend the government to their ends may also be able to prevent it from filing suit. The machinations of the wrongdoers, combined with the difficulty of inducing agents of the government to exact maximum effort at all times, may counsel permitting suits by indirect victims more freely in RICO cases than in the law of antitrust.

The Court anticipated a similar possibility in *Illinois Brick.* It said that an indirect purchaser may sue "where the direct purchaser is owned or controlled by" the wrongdoer. 431 U.S. at 736 n. 16, 97 S.Ct. at 2070 n. 16. See *In re Midwest Milk Monopolization Litigation,* 730 F.2d 528 (8th Cir.1984); *Arizona v. Shamrock Foods Co.,* 720 F.2d 1208 (9th Cir.1984). Doubtless indirectly injured parties could recover under RICO when they show that the directly injured party was under the continuing control or influence of the defendant or his henchmen. The plaintiffs in this case have not offered to show this, however, and they could not: the County has filed its own suit.

As a rule it is for the County rather than the federal courts to decide how best to induce its agents to protect the interests of the people. The County might establish *qui tam* actions in state court or offer bonuses to those who prosecute suits. It could authorize derivative litigation by private attorneys general if the proper authorities decline to act. And perhaps, whether or not the County adopts such devices, the attorneys who initiate enforcement through suits such as this one are entitled to fees under the "common fund" doctrine of *Trustees v. Greenough,* 105 U.S. (15 OTTO) 527, 26 L.Ed. 1157 (1881). None of these possibilities need detain us. No matter what the best way to motivate suit may be, only the County is entitled to prosecute under RICO this claim for lost taxes. The plaintiffs here do not act for or in the right of the county, so their suit was properly dismissed.

AFFIRMED.