In re **WYOMING TIGHT SANDS ANTITRUST CASES.**

Civ. A. No. 85-2349-S.

United States District Court, D. Kansas.

May 4, 1988.

Opinion on Motion for Certification June 7, 1988.

**1110**

Basil W. Kelsey, Frank B.W. McCollum, Terry W. Schackmann, Spencer, Fane, Britt & Browne, Overland Park, Kan.

Ralph Foster, Vice President & Gen. Counsel, John P. DeCoursey, Kansas Gas & Elec. Co., Wichita, Kan.

Robert T. Stephan, Atty. Gen., Topeka, Kan.

Thomas Greenan, Ferguson & Burdell, Seattle, Wash.

Jerome T. Wolf, Spencer, Fane, Britt & Browne, Kansas City, Mo.

Randolph G. Willis, Watson, Ess, Marshall & Enggas, Olathe, Kan.

J. Eugene Balloun, Shook, Hardy & Bacon, Overland Park, Kan.

Mick Lerner, Stinson, Mag & Fizzell, Overland Park, Kan.

Wayne Hundley, Deputy Atty. Gen., Chief, Consumer Protection & Antitrust Div., Topeka, Kan.

Donald D. Barry, Topeka, Kan.

Stephen P. Dees, Robert J. Hammer, Farmland Industries, Inc., Kansas City, Mo.

Jack C. Chestnut, Chestnut & Brooks, Minneapolis, Minn.

Douglas E. Nordlinger, Douglas G. Robinson, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C.

Fred H. Bartlit, Jr., David M. Stryker, Kirkland & Ellis, Chicago, Ill.

John T. Schmidt, Jane J. Welch, Mark Pennington, C. Kevin Morrison, Margaret A. Swimmer, Mary J. Rounds, Elizabeth Head, Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, Inc., Tulsa, Okl.

Lawrence M. Berkowitz, Frank L. Sallee, Matthew J. Verschelden, Stinson, Mag & Fizzell, Kansas City, Mo.

Darrel A. Kelsey, Ronald A. Skoler, Christian P. Mai, CSG Exploration Co., Tulsa, Okl.

Martin J. Keating, Chicago, Ill.

Colvin A. Peterson, Watson, Ess, Marshall & Enggas, Kansas City, Mo.

William L. Webster, Terry C. Allen, Shugart, Thomson & Kilroy, Jefferson City, Mo.

R. Lawrence Ward, W. Terrence Kilroy, Russell S. Jones, Jr., G. Adolph Schmidt, II, Shugart, Thomson & Kilroy, Kansas City, Mo.

Anthony Rupp, Shugart, Thomson & Kilroy, Overland Park, Kan.

Jerry M. Gross, Amoco Corp., Chicago, Ill.

William G. Levi, David R. Schlee, W. Woody Schlosser, Smith, Gill, Fisher & Butts, P.C., Kansas City, Mo.

L.K. Smith, John A. Burkhardt, Boone, Smith, Davis & Hurst, Tulsa, Okl.

John K. Rosenberg, Gen. Counsel, The Kansas Power & Light Co., Topeka, Kan.

Stan P. Doyle, James C. Thomas, Doyle & Harris, Tulsa, Okl.

Cloyd R. Mellott, Dale Hershey, D. Richard Funk, Mary K. Austin, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa.

William H. Sanders, Floyd Finch, Jr., Katharine Bunn, Sally Burger, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo.

James D. Griffin, Blackwell, Sanders, Matheny, Weary & Lombardi, Overland Park, Kan.

Randall B. Palmer, UtiliCorp United, Inc., Kansas City, Mo.

Thomas H. Brill, Deborah Farrar, Peterson & Farrar, Shawnee Mission, Kan.

David P. Mudrick, Director, Legal Services, The Kansas Power and Light Co., Topeka, Kan.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

These consolidated actions concern allegations that certain suppliers of natural gas conspired to fix inflated prices in violation of the federal antitrust laws. Several distinct categories of plaintiffs are suing several distinct categories of defendants. The issue presently before the court is ultimately one of standing: Who are the proper parties to assert the antitrust claims?

### I.

The facts can be simplified for purposes of the present dispute. Three companies (defendants Amoco Production Company; CSG Exploration Company, and Cities Service Oil and Gas Corporation) and two limited partnerships formed by the companies (defendants Moxa Limited Partnership and Wamsutter Limited Partnership) produced natural gas out of the Wyoming Tight Sands formation in the State of Wyoming. The companies, through the limited partnerships, contractually committed certain amounts of natural gas to the successors of defendant Williams Natural Gas Company (Cities Service Gas Company (CSGC), and Northwest Energy Company (NWC)), which operated an interstate pipeline and which had an affiliation with CSG. *See generally Midwest Gas Users Ass'n v. FERC*, 833 F.2d 341, 345–49 & nn. 3–5 (D.C.Cir.1987) (discussing the background of the various actors in this controversy). The allegation is that these six entities (the

three producing companies, two producing limited partnerships, and the pipeline) conspired to inflate prices.

The plaintiffs represent several vertical levels in relation to the pipeline. Farmland Industries, Inc. is an agricultural concern that purchased gas directly from the pipeline for its own consumption. Kansas Gas and Electric (KG & E) is a public utility that purchased gas directly for use in generating electricity, which was then delivered to industrial and residential consumers. Kansas Power and Light Company (KP & L) and Utilicorp United, Inc. (Utilicorp) are public utilities that purchased gas directly from the pipeline for their own industrial use and for delivery to industrial and residential consumers. The States of Kansas and Missouri have asserted two types of claims: (1) On behalf of residential consumers who purchased gas from the utilities, the States are in this lawsuit in a *parens patriae* capacity; and (2) On behalf of state agencies, municipalities, and other political subdivisions that purchased gas directly from the pipeline, the States are suing in a representative capacity. *See* Appendix to this Memorandum and Order (charting the vertical and horizontal relationships of the parties). The damages asserted by all plaintiffs arise from the allegedly illegal inflation of the price of natural gas. All plaintiffs seek reimbursement for the overcharge (along with the treble damage award in 15 U.S.C. § 15), with the utilities also alleging that the illegally inflated price of natural gas caused a decrease in consumer consumption and a corresponding decrease in profits. The utilities contend that because their rates are regulated, their profits are directly related to consumer demand.

Plaintiffs KG & E and KP & L and plaintiff-intervenor Utilicorp have moved to strike certain defenses or, in the alternative, for partial summary judgment. The defenses they seek to strike deal with the "pass-on" theory of avoiding anti-trust liability. Section 4 of the Clayton Act grants certain persons standing to bring an anti-trust lawsuit:

[A]ny person who shall be injured in his business or property by reason of any-

thing forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained. . . .

15 U.S.C. § 15 (1982). Defendants Cities Service Oil & Gas Corporation, GSG Exploration Company, Amoco Production Company, and Williams Natural Gas Company have asserted numerous defenses, including allegations that the public utility plaintiffs (1) lack standing under Section 4 and (2) have not been injured in their business or property under Section 4. These defendants allege that the utilities have passed on dollar-for-dollar any illegal increase in the price of natural gas, so that the consumer has borne the entire cost of any antitrust injury. This is the "pass-on" defense. The United States Supreme Court has abolished the pass-on theory, with several narrow exceptions. Defendants assert that these exceptions apply in this case.

## II.

In *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), a manufacturer of shoes sued a manufacturer and distributor of shoe machinery for violations of the Sherman Act, 15 U.S.C. § 4, alleging that the latter's practice of leasing and refusing to sell its more complicated and important shoe machinery was an instrument of unlawful monopolization. 392 U.S. at 483, 88 S.Ct. at 2226. United Shoe Machinery, the machine manufacturer, claimed that plaintiff Hanover Shoe suffered no legally cognizable injury, because the illegal overcharge was allegedly reflected in the price of Hanover's shoes, so that the consumer suffered the actual monetary injury. The court did not dispute the premise of this argument, but it found that Hanover Shoe was nevertheless entitled to bring the damage action:

We hold that the buyer is equally entitled to damages if he raises the price for his product. As long as the seller continues to charge the illegal price, he takes from

the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower.

*Id.* at 489, 88 S.Ct. at 2229. The Court noted with approval a line of cases in which the possibility that a plaintiff had recouped the overcharges from its customers was found to be irrelevant in assessing damages. *Id.* at 490, 88 S.Ct. at 2229. As an example of such a situation, the Court discussed a case in which it was alleged that a shipper of goods should not recover in an antitrust lawsuit against a common carrier railroad because the shipper is able to simply pass on to its customers an illegally high charge:

> "The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss. The plaintiffs suffered losses to the amount of the verdict when they paid. Their claim accrued at once in the theory of the law and it does not inquire into later events.... The carrier [*i.e.*, the railroad] ought not to be allowed to retain his illegal profit, and the only one who can take it from him is the one that alone was in relation with him, and from whom the carrier took the sum.... Probably in the end the public pays the damages in most cases of compensated torts."

*Id.* at 490–91 n. 8, 88 S.Ct. at 2230 n. 8 (quoting *Southern Pac. Co. v. Darnell–Taenzer Lumber Co.*, 245 U.S. 531, 533–34, 38 S.Ct. 186, 186, 62 L.Ed. 451 (1918)). *See also Associated General Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534 & n. 30, 103 S.Ct. 897, 906 & n. 30, 74 L.Ed.2d 723 (1983). This analysis is particularly appropriate in the present case, because the utilities have been analogized as being mere shippers or transporters of natural gas from the wellhead to the consumer.

The *Hanover Shoe* Court did recognize at least one possible exception to the unavailability of the pass-on defense—"when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged." 392 U.S. at 494, 88 S.Ct. at 2232. In so stating, the Supreme Court appeared to be referring to a discussion earlier in the opinion, in which the court justified elimination of the pass-on defense based on the "insurmountable" task of making a convincing showing on each element necessary to establish the applicability of the defense. The elements of the defense were: (1) The buyer raised his price in response to, and in the amount of, the overcharge; (2) The buyer's margin of profit and total sales had not thereafter declined; and (3) The buyer could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. 392 U.S. at 493, 88 S.Ct. at 2231. The only foreseeable instance in which these elements could be established would have been a fixed quantity, cost-plus contract, thereby creating the exception.

The other major Supreme Court opinion involving the pass-on defense was *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The ultimate holding of the *Illinois Brick* Court was that the *Hanover Shoe* analysis, which established the unavailability of the pass-on defense to a monopolizing manufacturer in a case brought by a direct purchaser-middleman, applies equally to an indirect purchaser-consumer who attempts to use the pass-on theory offensively by asserting that he has suffered the antitrust injury because the direct purchaser has passed on the entire illegal price increase. While the holding is certainly relevant to the present facts, of equal importance is the Court's interpretation and application of *Hanover Shoe*, along with an explanation of the scope of the exceptions to the general rule.

The defendants in *Illinois Brick* were manufacturers and distributors of concrete block. Their principal buyers were masonry contractors, who submitted bids to general contractors for the masonry portions of construction projects. In turn, the general contractors submitted bids for the overall construction project to customers

such as the State of Illinois and its political subdivisions. The State of Illinois, on behalf of in itself and its political subdivisions, filed an antitrust action against the defendants, alleging that the latter had engaged in a combination and conspiracy to fix prices in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. If all or part of the illegal overcharge was passed on by the masonry and general contractors to the plaintiffs, then seemingly the plaintiffs had been "injured in [their] person or property" under section 4 of the Clayton Act. 431 U.S. at 726–27, 97 S.Ct. at 2064–65.

The *Illinois Brick* Court reemphasized both the basic principle that the pass-on theory is not available in antitrust litigation and the limited role that any exception could be allowed to play. The Court acknowledged two possible exceptions. The first was the *Hanover Shoe* cost-plus exception:

> In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.

431 U.S. at 736, 97 S.Ct. at 2069–70.* As for the second, the Court noted in a footnote that "[a]nother situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer," *id.* at 736 n. 16, 97 S.Ct. at 2070 n. 16, although the Court did not explain the parameters of the "control" necessary to fall within this exception.

The *Illinois Brick* Court expressly considered permitting several vertical levels of injured persons to bring one lawsuit against the alleged wrongdoers (*i.e.,* as in the present case with direct and indirect purchasers), a seemingly logical, efficient, and fair way to allocate the totality of damages suffered as a result of antitrust activity. The allure of this procedure did not impress the Supreme Court:

> Permitting the use of pass-on theories under § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.

431 U.S. at 737, 97 S.Ct. at 2070. The Court's subsequent discussion of the difficult economic analyses that would have to be introduced in a case involving several levels of purchasers displays some fears that admittedly would not be present under the facts of this case. For instance, the Court noted the possibly incalculable effect that imperfectly competitive markets might have on the determination of damages, such as when direct purchasers compete with sellers who have not been subject to the overcharge. Of course, in the public utility area, the complete lack of competition eliminates this problem. The fact that the alleged antitrust activity took place in

---

* At least one federal judge has attempted to minimize the requirement that a contract under this exception must be of fixed quantity. In *Illinois ex rel. Hartigan v. Panhandle Eastern Pipe Line Co.,* 839 F.2d 1206, 1210 (7th Cir.1988) (Posner, J., dissenting in part), Judge Posner questioned whether the reference in *Illinois Brick* to "fixed quantity" was intended to state an independent requirement of the cost-plus exception or merely to describe a normal contract situation. *Id.* at 1211. As the majority in *Panhandle Eastern* noted, the *Illinois Brick* Court "regarded the predetermination of quantity as an essential element of the exception." *Id.* at 1209. Further-

more, as earlier discussed in this opinion, the *Hanover Shoe* Court originally imposed as an element of the pass-on defense a showing that total sales had not declined as a result of the increase in price precipitated by illegal antitrust activity. Both *Illinois Brick* and *Hanover Shoe* permit assertion of the pass-on defense only when the ultimate demand by consumers is perfectly inelastic—as in the case of existing fixed-quantity contracts—because of the "serious problems" in measuring the relative elasticities of demand. *Illinois Brick,* 431 U.S. at 742, 97 S.Ct. at 2073; *Hanover Shoe,* 392 U.S. at 493, 88 S.Ct. at 2231.

the context of a public utility direct purchaser renders inapplicable much of the rationale behind the decisions in *Illinois Brick* and *Hanover Shoe*, both of which involved manufactured goods in the free market. Moreover, the concern that the plaintiff's damages be proximately caused by the kind of antitrust activity that Congress contemplated in section 4, as expressed by a subsequent Supreme Court opinion, is significantly allayed in this case, where *the fact* of actual monetary injury to residential consumers of natural gas caused by the alleged price fixing is easily established. *See Associated General Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535–45, 103 S.Ct. 897, 907–12, 74 L.Ed.2d 723 (1983) (discussing the requirement of proximate cause). Nevertheless, the Supreme Court recognized the inevitability of a case involving less complicated factual difficulties and endeavored to make the general rule as pervasive as possible:

> It is quite true that these difficulties and uncertainties will be less substantial in some contexts than in others. There have been many proposals to allow pass-on theories in some of these contexts while preserving the *Hanover Shoe* rule in others....
>
> We reject these attempts to carve out exceptions to the *Hanover Shoe* rule for particular types of markets....
>
> [T]he process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum would entail the very problems that the *Hanover Shoe* rule was meant to avoid. The litigation over where the line should be drawn in a particular class of cases would inject the same "massive evidence and complicated theories" into treble-damages proceedings, albeit at a somewhat higher level of generality.

431 U.S. at 743–45, 97 S.Ct. at 2073–74.

In *Illinois Brick*, the Court certainly considered that by instituting direct purchasers as the injured parties with standing in an antitrust suit, some indirect purchasers who have suffered identifiable antitrust injury might be left uncompensated.

The Court did not believe this to be sufficient enough to overcome the other factors supporting the *Hanover Shoe* rule. *Id.* at 745–47, 97 S.Ct. at 2074–75. This demonstrates the extreme lengths to which the Court was willing to go in simplifying the already complex nature of an antitrust lawsuit.

The Supreme Court has issued several subsequent opinions concerning the proper plaintiff in an antitrust action. *See Associated General Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Blue Shield of Va. v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). In *McCready*, the plaintiff was a beneficiary under an employer-sponsored health plan. The plan followed a practice of reimbursing the costs of psychotherapy administered by psychiatrists but not by psychologists. Plaintiff was treated by a psychologist, and the plan denied her claim for reimbursement. The Court held that the plaintiff had standing to bring an antitrust lawsuit against the plan, but it found the policies of *Illinois Brick* inapplicable because in *McCready*, the plaintiff had suffered *direct* injury by the plan's refusal to pay her. 457 U.S. at 474–75, 102 S.Ct. at 2545–46. In *Associated General Contractors*, the Court found that a union does not have standing in an antitrust lawsuit brought against certain companies that induced landowners not to hire union contractors. In such a case, the coerced landowners or the union contractors have suffered the direct injury. 459 U.S. at 540–42, 103 S.Ct. at 909–11. The case is consistent with *Illinois Brick* and relied substantially on its analysis. 459 U.S. at 543–45, 103 S.Ct. at 911–12.

Having reviewed the relevant Supreme Court authority on the issue, the court will turn to the arguments of the parties and how they fit in the scheme of the cases discussed above.

### III.

First, plaintiffs States of Kansas and Missouri and the defendants [hereinafter

referred to as "the opposing parties"] argue that the utilities' motions are inappropriate because there has not been sufficient discovery in this litigation to fully disclose all possible factual issues. These cases were filed in 1985 and it is now 1988. The court does not intend to permit this litigation to drag on indefinitely. Furthermore, the court will not withhold disposition of the motions to strike or for partial summary judgment based on a possible or speculative issue of fact which the opposition has yet to determine. If the utilities can demonstrate the existence of all necessary, uncontroverted facts, there is no legal justification in withholding judgment, whether discovery has proceeded for twenty days or twenty years.

Along this same vein, the opposing parties ask the court to defer ruling on the issue because if facts or the law subsequently develop such that dismissed parties must be brought back into the litigation, the remaining parties will be prejudiced. The court believes that if the current state of the law requires dismissal, it would be inappropriate to defer a ruling based again on a possible change in the law or in the course of the litigation.

■ The principal alleged unestablished factual issue is whether the utilities passed on the entirety of any allegedly illegal overcharge. The opposing parties contend that if the facts establish that the rate systems governing the utilities permitted a total pass-through of any price increase (provisions titled "energy cost adjustment" or "purchased gas adjustment"), the arrangement would constitute the functional equivalent of the "cost-plus" contract exception recognized by *Hanover Shoe*. The parties appear to be asking for a "perfect pass-on" exception to the *Hanover Shoe* "no pass-on" rule. The argument for which the opposing parties now request additional discovery is precisely the argument that the Supreme Court overruled in *Hanover Shoe*. The Court expressly considered the situation in which a direct purchaser has passed on the *entire* illegal overcharge, and it rejected any dispositive effect this fact would have. 392 U.S. at

489–91 & n. 8, 88 S.Ct. at 2229–30 & n. 8. Other federal court decisions have recognized this and similarly held an absolute passing-on of an overcharge not to be dispositive. *Illinois ex rel. Hartigan v. Panhandle Eastern Pipe Line*, 839 F.2d 1206, 1209 (7th Cir.1988) ("[T]here could be a 'functional equivalent' of a cost-plus contract for a fixed quantity only where factors ... made inevitable an exact passing on of price variation *applied to a predetermined quantity....*") (emphasis added); *Carter v. Berger*, 777 F.2d 1173, 1175 (7th Cir.1985) ("[T]he direct purchaser recovers from the wrongdoer the full overcharge, trebled, even if it also recovered the whole overcharge by raising its own prices."). The court does not believe it necessary to wait upon evidence establishing the degree to which the utilities passed on the overcharge, when the Supreme Court has already disregarded its impact. In fact, under the Supreme Court's analysis, the only factual issue that would have relevance here is whether the delivery of natural gas to consumers was made pursuant to fixed quantity contracts. However, both sides agree that consumer demand for natural gas is governed neither by a fixed-quantity contract nor by anything resembling its "functional equivalent."

■ Besides the cost-plus contract exception, the parties opposing the present motions have attempted to assert several other exceptions. The first is the control exception noted by the Supreme Court in *Illinois Brick*: An indirect purchaser is a proper party when the direct purchaser is owned or controlled by its customer (or vice versa, as other federal courts have held). The Sixth Circuit has read this exception as being limited to relationships "involving such functional economic or other unity between the direct purchaser and ... the defendant ... that there effectively has been only one sale." *Jewish Hosp. Ass'n v. Stewart Mechanical Enter., Inc.*, 628 F.2d 971, 975 (6th Cir.1980), *cert. denied*, 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981). The court does not believe that even a colorable claim can be made to economically tie these public utilities so closely to residential consumers that the

relationship is within that contemplated by the Supreme Court. The utilities are for-profit, publicly held corporations and simply do not fit within this exception.

■ The second exception asserted by the opposing parties, and one that has not been addressed by the Supreme Court, is not really an "exception" at all. The theory is that when the direct purchaser participated in the allegedly illegal activities, the indirect purchaser would be the proper plaintiff. Of course, if a direct purchaser utility has participated in antitrust activity, it should be a named defendant just as the pipeline company is in the present case. In such a situation, residential and industrial consumers would become the "direct purchasers" for purposes of the *Hanover Shoe* analysis, because they would be the first purchasers outside the conspiracy. They would not be considered "indirect purchasers" at all. Clearly, all parties in the present litigation are operating under the premise that the utilities hold the status of "direct purchasers," although the predecessors of Williams Natural Gas Company were in fact the first purchasers of natural gas from the producers. Because the pipeline company is alleged to have participated in the conspiracy, the utilities are considered the direct purchasers. The court has been shown no credible evidence that the utilities were part of the antitrust conspiracy in this case, nor has any such claim been filed in this suit. Therefore, the co-conspirator theory is inapplicable.

■ The opposing parties' arguments have failed to convince this court of the inapplicability of *Hanover Shoe* and *Illinois Brick*. It is not a result of irrational, dogmatic adherence to precedent that this is so. There are principled reasons why the pass-on defense should not be permitted in this case. For example, the Supreme Court recognized that a goal of the antitrust laws is compensating the victims of antitrust activity. *Illinois Brick*, 431 U.S. at 746, 97 S.Ct. at 2075. In fact, in his dissent from *Illinois Brick*, one of Justice Brennan's main concerns was that by denying the pass-on defense, "[i]njured consumers are precluded from recovering damages

from manufacturers." *Id.* at 749, 97 S.Ct. at 2076 (Brennan, J., dissenting). However, any recovery by the utilities in this case will be passed on in substantial part to the consumers. The ratemaking authorities adjust the utilities' charges after considering all sources of income and expense. If the utilities prevail on their antitrust claim, their recovery will be passed on to the consumers either through a reduction in prices or through a rebate. This appears to be an eminently fair and efficient means of apportioning any damage award, much more so than through protracted litigation.

Additionally, the Supreme Court expressed concern that by including indirect purchasers, the ensuing "massive and complex damages litigation not only burdens the courts, but also undermines the effectiveness of treble-damages suits." *Associated General Contractors*, 459 U.S. at 545, 103 S.Ct. at 912. Moreover, the participation of indirect purchasers "would increase the overall costs of recovery by injecting extremely complex issues into the case." *Illinois Brick*, 431 U.S. at 745, 97 S.Ct. at 2074. Regardless of the opposing parties' representations that disposing of the pass-on defense would not affect the complexity of the litigation, the court believes that the more focused the issues become, the less time and expense this litigation will produce, ultimately benefitting all interests. The residential consumer will receive a greater benefit if attorney's fees and costs are held to a minimum.

The court is by no means going out on a limb in confirming the applicability of *Hanover Shoe* to these facts. Just recently the Seventh Circuit came to the same conclusion on almost identical facts. In *Illinois ex rel. Hartigan v. Panhandle Eastern Pipe Line Co.*, 839 F.2d 1206 (7th Cir.1988), the court agreed that in a case involving a public utility which asserted an antitrust claim against a natural gas pipeline, many of the Supreme Court's concerns in *Hanover Shoe* and *Illinois Brick* were not as prevalent, such as the avoidance of multiple recoveries or the complexity of an economic determination of damages. The court held, however, that *"Illinois Brick*

did not ... leave it to the discretion of the lower courts to expand the exceptions to include situations within some range of approximation of the exceptions defined in *Illinois Brick.*" *Id.* at 1210. This court agrees with the analysis and decision in *Panhandle Eastern.*

For the reasons outlined above, the court finds that partial summary judgment is proper on the pass-on defense. In so finding, the court does not intend to determine the validity of a standing defense or other defense which relies on an allegation that any damages have not been the result of the type of antitrust injury contemplated by the statute, or a defense that the defendants have not engaged in antitrust activity. The court only holds that the defendants may not use the pass-on defense in arguing that any injury produced by the alleged activity has been passed through to residential and industrial consumers.

The court also is not inclined to grant Utilicorp's other requests to strike. To the extent that any defense raised by defendants is inapplicable to Utilicorp or any other plaintiff, the court directs defendants to clear up their positions in the final pretrial order. If at that time defendants persist in asserting defenses that any of the plaintiffs find inapplicable, an additional motion for summary judgment may be filed.

## IV.

■ The result reached by the court presents a problem as to the status of the States of Missouri and Kansas. The court has determined that the utilities are the proper parties to assert the antitrust claim relating to natural gas delivered to residential consumers, if indeed any compensable antitrust injury has been incurred. While it may be true that the residential consumers represented by the States have suffered actual tangible injury, "[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may not be a proper plaintiff under § 4 for other reasons." *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 489 n. 5, 93 L.Ed.2d 427, 436 n. 5 (1986). Having determined that the treble damage remedy is not afforded to residential and industrial indirect purchasers, these persons do not have standing in this lawsuit. Dismissal of these claims need not await further briefing, because all participants in this lawsuit have recognized that the utilities' motions were, in reality, motions to dismiss the States of Kansas and Missouri in their *parens patriae* capacity. Therefore, the court will dismiss the *parens patriae* claims asserted by the States of Kansas and Missouri.

IT IS BY THE COURT THEREFORE ORDERED that plaintiffs Utilicorp, KG & E, and KP & L's motions for partial summary judgment be granted solely on the pass-on defense. IT IS FURTHER ORDERED that plaintiffs' motions to strike be denied. IT IS FURTHER ORDERED that the claims of the States of Kansas and Missouri as *parens patriae* for their citizens who purchased natural gas from a public utility be dismissed for lack of standing.

dotted lines reflect unrepresented claims

## ON MOTION FOR CERTIFICATION

On May 4, 1988, the court issued a Memorandum and Order effectively disposing of the States of Kansas and Missouri's *parens patriae* claims in the above-captioned litigation. In support of the decision, the court cited *State of Illinois ex rel. Hartigan v. Panhandle Eastern Pipe Line Co.*, 839 F.2d 1206 (7th Cir.1988). The States of Kansas and Missouri now represent to the court that the opinion in *Panhandle Eastern* has been withdrawn and a motion for rehearing en banc has been granted. The States ask this court alternatively to (1) vacate and rehear or reconsider the opinion of May 4, (2) designate the order as final and appealable under Federal Rule of Civil Procedure 54(b), or (3) certify the issue to the Tenth Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(b). Plaintiffs Utilicorp and KP & L would oppose reconsideration but would acquiesce in an order under 54(b) or 1292(b).

The court finds certification under 1292(b) to be appropriate in this situation. That statute states in relevant part:

When a district judge, in making in a civil action and order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

The May 4 Memorandum and Order is not otherwise appealable, because it resolves less than all the claims of less than all the parties, and the court is not inclined to permit interlocutory appeal under Rule 54(b). Furthermore, as is evident from the court's order and from the recent action of the Seventh Circuit, the legitimacy of a *parens patriae* claim in this litigation is certainly an area of dispute to which the Tenth Circuit has not spoken. This issue controls several claims of Kansas and Missouri, and an immediate appeal could avoid the possibility of having to conduct two trials in this extremely complex litigation.

The facts of this case present precisely the type of situation contemplated by Congress in section 1292(b).

Therefore, the court will certify the following question to the Tenth Circuit Court of Appeals:

In a private antitrust action under 15 U.S.C. § 15 involving claims of price fixing against the producers of natural gas, is a State a proper plaintiff as *parens patriae* for its citizens who paid inflated prices for natural gas, when the lawsuit already includes as plaintiffs those public utilities who paid the inflated prices upon direct purchase from the producers and who subsequently passed on most or all of the price increase to the citizens of the State?

Pursuant to 28 U.S.C. § 1292(b), this certification shall not stay the proceedings in this court.

IT IS BY THE COURT THEREFORE ORDERED that the States of Kansas and Missouri's joint motion for certification pursuant to 28 U.S.C. § 1292(b) be granted; IT IS FURTHER ORDERED that all other requested relief be denied.