In re AMERICAN RESERVE
CORPORATION, Debtor.

J. William HOLLAND, Trustee for
American Reserve Corporation,
Plaintiff,

v.

ALEXANDER GRANT & CO.,
Defendant.

J. William HOLLAND, Trustee for
American Reserve Corporation,
Plaintiff,

v.

ARTHUR ANDERSEN & CO.,
Defendant.

Bankruptcy No. 86 C 833.
Adv. Nos. 82 A 4214, 83 A 2485.

United States District Court,
N.D. Illinois, E.D.

Jan. 23, 1987.

William H. Luking, Jeffrey M. Cross, Timothy E. Trinka, Deborah S. Pardini, Ross & Hardies, Chicago, Ill., for trustee.

Stanley J. Parzen, Mayer, Brown & Platt, Chicago, Ill., for Alexander Grant & Co.

Charles W. Boand, Robert F. Forrer, Dennis J. O'Hara, Quinton F. Seamons, Wilson & McIlvaine, Chicago, Ill., for Arthur Andersen.

Bruce L. Bower, Scott J. Szala, Winston & Strawn, Chicago, Ill., for John J. Tickner.

## MEMORANDUM OPINION

KOCORAS, District Judge:

The plaintiff in these consolidated adversary proceedings, J. William Holland, is the trustee in bankruptcy for the estate of American Reserve Corporation ("ARC"). ARC was an insurance holding company whose subsidiaries were engaged primarily in property and casualty insurance, concentrating in specialized coverage lines. Two of ARC's principal operating subsidiaries, Reserve Insurance Company ("Reserve") and American Reserve Insurance Company ("ARIC"), suffered economic reverses and were placed into liquidation by state regulatory authorities on May 29, 1979 and June 7, 1979, respectively. A third subsidiary, Market Insurance Company ("Market") was placed into rehabilitation on July 29, 1979 and was subsequently placed in liquidation. ARC filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code on April 21, 1980. The chapter 11 proceeding was converted to a

chapter 7 liquidation proceeding on ARC's motion on November 16, 1981.

The trustee filed lawsuits in the Circuit Court of Cook County against Arthur Andersen & Co. and Alexander Grant & Co. on October 22, 1982. Both actions alleged common law fraud, breach of contract, and civil conspiracy claims based on audits of ARC's consolidated financial statements conducted by Andersen and Grant. Grant removed the suit against it to the bankruptcy court on November 24, 1982. The trustee moved to remand the action to the state court, but the bankruptcy court denied the motion.[1]

On August 31, 1983, the trustee amended the complaint against Grant to add a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68. The complaint against Grant presently contains nine counts: three common law fraud claims, four breach of contract claims, one common law conspiracy claim, and the RICO claim. All nine counts stem from Grant's audit of ARC's consolidated financial statement for the fiscal year ended December 31, 1977. Although the financial statement allegedly misrepresented ARC's financial condition in several particulars, Grant issued an unqualified opinion with respect to the statement. Because of the fraudulent nature of the financial statement, steps were not taken to eliminate ARC's insolvency or prevent the insolvency of its principal operating subsidiaries. As a result, ARC lost its principal assets—the operating subsidiaries which were placed in liquidation.

On the same date, the trustee filed a three-count civil RICO action against Andersen. Count I is based on Andersen's purported failure to disclose the impact of adverse loss developments during 1976 on ARC's 1975 consolidated financial statement, which Andersen audited, and to alter accordingly its unqualified opinion upon reissuance of that statement. Count II stems from Andersen's failure to disclose,

in a proxy statement mailed to shareholders on April 9, 1976 and in a letter accompanying a Form 8–K Report filed with the Securities and Exchange Commission on May 10, 1976, that disagreements with ARC's management regarding the adequacy of loss reserves led to Andersen's removal as ARC's independent auditor. In Count III, the trustee alleges that Andersen should have disclosed in its opinions on ARC's 1974 and 1975 consolidated financial statements the impact of a reinsurance agreement entered by Reserve and Societe Commerciale de Reassurance ("SCOR") and a corresponding retrocession of most of the risk ceded to SCOR to another ARC subsidiary.

Both actions have been withdrawn from the bankruptcy court, and Grant and Andersen have moved to dismiss the complaints against them, raising numerous arguments in support of their motions.

First, Andersen contests the court's subject matter jurisdiction. The gist of Anderson's argument is that jurisdiction over the subject matter of the complaint was lost when the Interim or Emergency Jurisdictional Rule, upon which bankruptcy jurisdiction was premised following the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), expired on June 27, 1984. Andersen contends that the bankruptcy jurisdiction of the district courts as well as that of the bankruptcy courts expired on that date and that this expiration continued until the Bankruptcy Amendments and Federal Judgeship Act of 1984 became effective on July 10, 1984. Andersen further contends that jurisdiction over the complaint could only be regained by refiling this action after June 10, 1984.

Andersen misconstrues the scope of the *Marathon* decision and the Interim Rule. After the *Marathon* decision, jurisdiction in bankruptcy cases reverted to the district courts; it was not lost altogether.

---

1. The Circuit Court of Cook County dismissed the suit against Andersen, but that decision was later reversed. *See Holland v. Arthur Andersen & Co.*, 127 Ill.App.3d 854, 82 Ill.Dec. 885, 469 N.E.2d 419 (1984).

The Interim Rule then redelegated some of that jurisdiction to the bankruptcy courts as adjuncts of the district court. Thus, when the Interim Rule expired on June 27, 1984, bankruptcy jurisdiction again reverted to the district court—it did not expire. *See In re Casey Corp.*, 46 B.R. 473, 476 (S.D.Ind.1985). Thus, the court has subject matter jurisdiction over this action.

■ Grant objects to the trustee's amendment of the complaint on August 31, 1983 adding the civil RICO claim, without seeking leave of court. Federal Rule of Civil Procedure 15(a) provides that a "party may amend his pleading once as a matter of course at any time before a responsive pleading is served." Grant does not contend that it had filed a responsive pleading prior to the amendment, but rather argues that by moving to remand, the trustee waived his right to amend by adding a federal law count. Grant relies on the trustee's application to remand in which he stated:

> The Trustee's eight count complaint against Grant is based exclusively on causes of action under Illinois law and raises no questions of bankruptcy or other Federal law. In particular, the complaint does not raise any questions under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

Almost three months after his application to remand was denied, the plaintiff filed his amended complaint adding the RICO count. Grant contends that the trustee's conduct "worked a waiver of [his] right to add [his] RICO allegations 'as a matter of course.'"

In support of his position that the right to amend a pleading once as of course may be waived, the trustee relies upon a sentence in 3 Moore's Federal Practice ¶ 15.-07(2), at 15–56 (2d ed. 1983). The sentence is incomplete, however, as quoted in Grant's brief and has apparently been deleted from the most recent edition of Moore's. Grant has failed to cite any case in which a party was found to have waived his right to amend his pleading, and the trustee has stated that he was unable to

locate any case which so holds. On such scant authority, the court is unwilling to find that the trustee waived his right to amend the complaint.

Both Andersen and Grant contend that the RICO claims must be dismissed on the ground that ARC would not be a proper party to bring this suit and that ARC's trustee is, therefore, not a proper plaintiff either.

■ Federal Rule of Civil Procedure 17(a) provides that "[e]very action shall be prosecuted in the name of the real party in interest." The real party in interest is the one who "by the substantive law, possesses the right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." *Illinois v. Life of Mid-America Insurance Co.*, 805 F.2d 763, 764 (7th Cir.1986) (quoting C. Wright, Law of Federal Courts § 70 (4th ed. 1983)). Where the right asserted is based upon a federal statute, the real party in interest must be determined according to the federal substantive law. *Id.*

The civil damages provision of RICO, 18 U.S.C. § 1964(c), provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter ... shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." Despite the literal wording of the statute, the Seventh Circuit held in *Carter v. Berger*, 777 F.2d 1173 (7th Cir.1985), that some persons who can prove an injury resulting from a RICO violation do not have standing to seek redress under the RICO's civil damages provision.

The *Carter* plaintiffs were taxpayers who sued a defendant who had plead guilty to charges that he bribed members of the county board of tax appeals to obtain lower assessments on his clients' property, acts that could constitute a RICO violation because they entailed multiple violations of state bribery laws and the federal mail fraud statute. The plaintiffs alleged that they were injured because the county increased their rate of taxation to offset the decrease in valuation of Berger's clients

property. The Seventh Circuit held that the taxpayers were indirectly injured parties who could not assert a RICO claim, but that the county, as the directly injured party, could sue. The court found that to allow indirectly an injured party to sue would expose the defendants to duplicative liabilities so as to increase the congressional penalty of treble damages to sextuple damages and that an indirectly injured party "should look to the recovery of the directly injured party, not to the wrongdoer, for relief." *Id.* at 1176.

In reliance upon *Carter*, this court dismissed a RICO claim on the ground that the plaintiff lacked standing in *Todd v. Bio-Scientific Clinical Laboratory, Inc.,* No. 85–9163 (N.D.Ill. April 14, 1986) [Available on WESTLAW, DCTU database]. The plaintiff in *Todd*, a twenty-five percent shareholder and former president of Bio-Scientific, brought a RICO action against Bio-Scientific and six individuals who were shareholders, officers, and directors of the corporation, alleging that the defendants had defrauded the Medicaid program of the State of Illinois by submitting bills for unnecessary medical tests. Todd alleged that these actions harmed her by jeopardizing her eligibility for Medicaid programs, forcing her to resign her position as president to avoid participation in criminal activity, and diminishing the value of her stock. This court concluded that former employees and shareholders of a corporation indirectly injured by a RICO violation which directly injured the corporation could not recover under civil RICO. The court stated:

> As with antitrust standing, a determination of civil RICO standing must focus on whether the particular plaintiff is an appropriate enforcer. This requires balancing the interests of private enforcement and redress for injury against the avoidance of excessive treble damages litigation ... To paraphrase the Seventh Circuit, an appropriate balance is achieved by granting standing only to those who suffer immediate injuries with respect to their business or property, while excluding persons whose injuries

were caused more indirectly by defendant's conduct ... Those directly injured often have the greatest opportunity to discover a RICO violation at the least cost.

Mem. op. at 5–6. The court's conclusion that injuries to Todd as a shareholder and former president were too remote from the alleged illegal conduct to confer RICO standing upon her was consistent with decisions of courts in this district and elsewhere on the scope of RICO standing. *See Rand v. Anaconda-Ericsson, Inc.,* 794 F.2d 843, 849 (2d Cir.1986); *Warren v. Manufacturers National Bank,* 759 F.2d 542, 544 (6th Cir.1985); *Nordberg v. Lord, Day & Lord,* 107 F.R.D. 692, 699 (S.D.N.Y. 1985); *Greenberg v. Technicare Corp.,* No. 85–5436 (N.D.Ill. Aug. 13, 1986) [Available on WESTLAW, DCTU database] (Hart, J.); *Rokeach v. Eisenbach,* No. 85–1106 (N.D. Ill. Dec. 3, 1985) (Plunkett, J.); *Gallagher v. Canon U.S.A., Inc.,* 588 F.Supp. 108, 110–11 (N.D.Ill.1984) (Shadur, J.); *see also Dana Molded Products, Inc. v. Brodner,* 58 B.R. 576 (N.D.Ill.1986) (Getzendanner, J.) (creditors lacked standing to bring RICO action for harm to corporation).

■ ARC did not itself engage in the insurance business but rather was a holding company, acting as parent to subsidiaries, primarily Reserve and Market, that conducted insurance business. ARC's insolvency was caused by the financial losses and ultimate demise of Reserve, its primary operating subsidiary and one of its principal assets. ARC's status as Reserve's parent and, indirectly, sole shareholder places ARC on equal footing with the plaintiff in *Todd,* an indirectly injured party whose damages stem from the diminution in the value of its stock in a corporation more directly injured by the defendant's racketeering activity.

The trustee argues that ARC is more than a mere shareholder and that ARC was injured in its own right when it was kept in business past its point of insolvency. However, ARC was insolvent only because Reserve (and perhaps other ARC subsidiaries) was insolvent. ARC was driven deeper

into insolvency because Reserve was driven deeper into insolvency.

Permitting ARC's trustee to prosecute these RICO claims would essentially permit ARC to recover for the same injuries for which Reserve's trustee, acting on Reserve's behalf, seeks to recover in *Washburn v. Brown*, No. 81–1475 (N.D.Ill. filed March 16, 1981) Treble damages, not sextuple damages, are the penalty Congress selected for a civil RICO violation. *Carter*, 777 F.2d at 1176. Thus, ARC as an indirectly injured party, must look to the recovery of Reserve, the directly injured party, and not to the wrongdoers, for relief.

The trustee emphasizes ARC's contractual relationships with Grant and Andersen arising from the accounting firms' engagements to perform audits of ARC's financial statements, a relationship which was absent between the plaintiff and the defendant in *Gallagher*, 588 F.Supp. at 110. A contractual relationship is neither necessary nor in this case sufficient to confer RICO standing, and *Gallagher* does not suggest otherwise. See *id.*, especially n. 2. Therefore, the court concludes that the trustee lacks standing to bring the RICO claims alleged against Andersen and Grant, and they are accordingly dismissed.

Dismissal of the RICO claims leaves only the trustee's state law claims against Grant. Grant has moved to dismiss the state law fraud claims, Counts I, IV, and VII, on the grounds that ARC cannot demonstrate it relied on Grant's misrepresentations under the rationale of *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982), and that the trustee has not alleged fraud with sufficient particularity. Neither of these arguments has merit.

Grant argues that because ARC prepared the 1977 consolidated financial statement itself and Grant merely reviewed ARC's work and issued the opinion letter, ARC's top managers and directors knew everything that Grant allegedly failed to reveal. Grant contends that this knowl-edge must be imputed to ARC, precluding it from recovering for fraud.

The leading case discussing imputation of knowledge of corporate officers in the area of accountant liability under Illinois law is *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982). In *Cenco*, a corporation sued its independent auditors, Seidman & Seidman, for fraud and breach of contract. During the time Seidman was Cenco's auditor, a massive inventory fraud involving Cenco's top management occurred. The fraud consisted of inflating inventories above their actual value which, in turn, increased Cenco's apparent worth and the market price of its stock and permitted Cenco to borrow money at lower rates. At trial, Cenco presented evidence that Seidman had been careless in checking Cenco's inventory figures and its carelessness had prevented the fraud from being "nipped in the bud" and that as the fraud expanded, Seidman's auditors became suspicious, but concealed their suspicions and continued to give Cenco a clean bill of health. *Id.* at 452. Seidman's evidence indicated that it had diligently attempted to follow up all signs of fraud, but had been thwarted by Cenco's managers.

The main issue before the appeals court in *Cenco* was whether the jury had been properly instructed that Seidman was entitled to use, through imputation, the wrongdoing of Cenco's managers as a defense against Cenco's allegations of breach of contract, negligence, and fraud. The Seventh Circuit held that the instruction was proper and further concluded that the acts of Cenco's managers amounted to acts of fraud on behalf of the corporation as opposed to acts of fraud against the corporation and that policy dictated that Cenco be precluded from recovering for fraud from which it actually benefited. *Id.* at 455–56. The court stated that "a participant in a fraud cannot also be a victim entitled to recover damages, for he cannot have relied on the truth of the fraudulent representations, and such reliance is an essential element in a case of fraud." *Id.* at 454. *See*

*also Security America Corp. v. Schacht,* No. 82–2132 (N.D.Ill. Jan. 31, 1981) (dismissing securities fraud claims against outside accounting firms under rationale of *Cenco.*)

The Seventh Circuit discussed the application of *Cenco* to circumstances closely related to those presented by this case in *Schacht v. Brown,* 711 F.2d 1343 (7th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983). In *Schacht,* the Illinois Director of Insurance, as liquidator of ARC's principal operating subsidiary, Reserve, filed a RICO claim against the officers, directors, and independent auditors (including Grant) of Reserve and ARC, stemming from the failure to disclose Reserve's insolvency and the true effects of a reinsurance agreement.[2] The outside accounting firms moved to dismiss the RICO claim under the rationale of *Cenco.* The Seventh Circuit found *Cenco* inapplicable to federal RICO claims, but further found that *Cenco* would not bar the liquidator's claims because the alleged fraudulent scheme—in which Reserve was "fraudulently continued in business past its point of insolvency and systematically looted its most profitable and least risky business"— could in no way be described as beneficial to Reserve. *Id.* at 1347–48. The court continued:

> the fact that Reserve's existence may have been artificially prolonged pales in comparison with the real damage allegedly inflicted by the diminution of its assets and income. Under such circumstances the prolonged artificial insolvency of Reserve benefited only Reserve's managers and the other alleged conspirators, not the corporation.

*Id.* at 1348.

The Illinois Appellate Court rejected the position advocated here by Grant in the trustee's parallel state court proceeding against Arthur Andersen. *See Holland v. Arthur Andersen & Co.,* 127 Ill.App.3d 854, 82 Ill.Dec. 885, 469 N.E.2d 419 (1984).

After reviewing the *Cenco, Schacht* and *Security America* decisions, the Illinois Appellate Court concluded that the actions of ARC's top management could not be imputed to ARC since ARC did not benefit from the alleged misconduct. The court stated, "While such misconduct on the part of Andersen may also have been done in a knowing fashion by ARC, there are no allegations in the complaint which establish that the purported misconduct on the part of ARC's top management was committed on behalf of ARC." 82 Ill.Dec. at 893, 469 N.E.2d at 427.

■ Although Grant argues that the Illinois Appellate Court misapplied *Cenco* and *Schacht* and that its opinion, therefore, should not be followed, the state court's result was plainly dictated by the Seventh Circuit decisions. The discussion in *Schacht,* in particular, compels this court to conclude that the trustee's fraud claims are not barred by *Cenco* because the alleged fraud was committed against ARC, not on its behalf.

■ Grant also contends that fraud claims fail to satisfy the command of Federal Rule of Civil Procedure 9(b), applicable here through Bankruptcy Rule 7009, which provides that circumstances constituting fraud must be stated with particularity. Although the court is sensitive to the particular need for specificity where charges of fraud are levelled against professionals "whose reputations in their field of expertise are most sensitive to slander," *Rich v. Touche Ross & Co.,* 68 F.R.D. 243, 245 (S.D.N.Y.1975), the allegations here identify the misleading statements and in what respects those statements were purportedly false, misleading, or inaccurate or omitted material facts and apprise Grant of its role in the fraud and the manner in which it was remiss. Rule 9(b) requires no more. *See Rich,* 68 F.R.D. at 246.

■ Counts II, III, V, and VIII are breach of contract claims. ARC asserts

---

2. The failure to disclose the impact of the reinsurance agreement forms the basis for the fraud claim Count VII of this suit.

that Grant audited ARC's 1977 financial statement pursuant to a written contract in the form of an engagement letter. Although ARC no longer possesses a copy of that letter, a copy produced by Grant, to which ARC has not objected, states:

> An examination made in accordance with generally accepted auditing standards is subject to certain limitations and the inherent risk that error or irregularities, if they exist, will not be detected. However, if during the course of our examination such errors and irregularities come to our attention, we will so notify you. Should you then wish us to expand our normal auditing procedures, we will consider entering into a separate engagement for that purpose.

ARC contends that Grant further agreed, implicitly, to render its services "with that degree of skill, care, knowledge, and judgment usually possessed by members of the accounting profession engaged in audits of property and liability insurance companies." Amended Complaint, Count II, ¶ 7; Count III, ¶¶ 7–8; Count V, ¶ 7; Count VIII, ¶ 8. ARC alleges that Grant breached the contract by failing to disclose the inadequacy of ARC's loss reserves, by failing to employ audit personnel with sufficient skill, by failing to disclose adverse developments on ARC's 1976 loss reserves in 1977, and by failing to disclose the impact of the reinsurance treaty on the financial position of ARC and its subsidiaries.

Grant argues that these allegations sound in tort, not contract, citing *Carr v. Lipshie*, 8 A.D.2d 330, 187 N.Y.S.2d 564 (App.Div.1959), *aff'd*, 9 N.Y.2d 983, 218 N.Y.S.2d 62, 176 N.E.2d 512 (1961) and other cases from jurisdictions other than Illinois. Under Illinois law, however, a professional may impliedly contract to render services in a manner consistent with the skill and care of those in the profession. *See Zostautas v. St. Anthony DePadua Hospital*, 23 Ill.2d 326, 178 N.E.2d 303 (1961); *Board of Education v. Del Bianco & Associates*, 57 Ill.App.3d 302, 14 Ill.Dec.

674, 372 N.E.2d 953 (1st Dist.1978). Actions in contract may be based on this implied obligation; in such actions, liability is predicated on the failure to perform an agreed undertaking rather than upon negligence. *Zostautas*, 23 Ill.2d at 329, 178 N.E.2d at 304–05.

Furthermore, the defendant's attempts to distinguish *Holland v. Arthur Andersen & Co.*, 127 Ill.App.3d 854, 82 Ill.Dec. 885, 469 N.E.2d 419 (1984), in which the Illinois Appellate Court upheld similar breach of contract claims against Andersen, are not persuasive. Grant contends that by "expressly promis[ing] to disclose all irregularities that come to its attention," 82 Ill.Dec. at 895, 469 N.E.2d at 429, Andersen guaranteed a specific result. By agreeing to notify ARC of such errors or irregularities that come to its attention during the course of its examination, Grant made a virtually identical promise.[3] The trustee has adequately alleged that Grant agreed to notify ARC of any errors or irregularities it uncovered and to use the degree of skill, care, and competence expected of accountants in performing audits and that Grant breached the contract when it failed to do so.

■■■ Count VI charges that Grant conspired with Coopers & Lybrand, which audited ARC's 1976 consolidated financial statement, to conceal the necessity of reporting a $22 million adjustment in prior years' loss reserves as a "prior period adjustment" rather than a "change in estimate." A charge of civil conspiracy is not an actionable tort in itself. *Barrett v. Baylor*, 457 F.2d 119, 124 (7th Cir.1972). Thus, a combination of two or more persons for whatever purpose does not give rise to a cause of action; rather it is the wrongful acts alleged done in pursuance of the agreement that may result in liability. *Dymek v. Nyquist*, 128 Ill.App.3d 859, 83 Ill.Dec. 52, 58, 469 N.E.2d 659, 665 (1984). In this case, the complaint adequately alleges acts of fraud and misrepresentation.

---

**3.** Whether Andersen agreed to disclose all "irregularities" while Grant agreed to notify ARC of both "irregularities" and "errors" is immaterial here.

In conclusion, because the court concludes that the trustee lacks standing to bring the RICO claims against Grant and Alexander, they are dismissed. The remaining counts against Grant state claims upon which relief can be granted under Illinois law and will not be dismissed.